Filed 2/26/20; Certified for Publication 3/18/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E070518 |
| v. | (Super.Ct.No. INF1600985) |
| MARIO CRUZ, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Otis Sterling, Judge. Affirmed as modified with directions.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel, Tami Falkenstein Hennick and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury found defendant and appellant, Mario Cruz, Jr., guilty as charged of committing several offenses against his former girlfriend, Jane Doe:  stalking Jane while a restraining order prohibiting defendant from contacting Jane was in effect (Pen. Code, § 646.9, subd. (b); count 1);[1] vandalism of more than $400 (§ 594, subd. (b)(1); count 2); violating a criminal protective order, by an act or credible threat of violence, within seven years of suffering a prior conviction for violating such an order (§ 273.6, subd. (d); counts 3, 6, 7, & 9); and making criminal threats (§ 422; counts 5 & 8).[2]  The court found defendant had one prison prior[3] (§ 667.5, subd. (b)) and sentenced defendant to an aggregate term of six years four months in state prison.[4]

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Defendant was acquitted of assault with a deadly weapon in count 4. (§ 245, subd. (a)(1).)  A mistrial was declared on count 10, in which defendant was charged with intimidating Jane as a witness (§ 136.1, subd. (c)(1)), after the jury failed to reach a verdict on count 10.

[3]  The trial court found not true additional allegations that defendant had a prior serious felony conviction (§ 667, subd. (a)) and a prior strike conviction (§§ 667, subds. (a), (c), (e)(1), 1170.12, subd. (c)(1)).  The allegations were based on defendant's 2009 Arizona conviction for attempted aggravated assault.  The court found that this conviction did not qualify as a serious or violent felony in California.

[4]  Defendant's six-year four-month sentence is comprised of the upper term of four years for his stalking conviction in count 1, plus consecutive eight-month terms (one-third the middle term) for his vandalism conviction in count 2 and his criminal threats conviction in count 5, plus one year for the prison prior.  Concurrent, two-year terms were imposed on defendant's other convictions:  his criminal threats conviction in count 8 and his convictions in counts 3, 6, 7, and 9 for violating a criminal protective order.  No terms were stayed.  (§ 654.)

2

Defendant raises four claims of error in this appeal. First, he claims his criminal threats conviction in count 5 must be reversed because the court erroneously admitted threatening Facebook messages sent to Jane from fictitious Facebook accounts to support the charge in count 5. Specifically, he claims the prosecution failed to authenticate the Facebook messages as having been sent to Jane by defendant. We conclude the messages were adequately authenticated based on their content, together with the testimony of Jane and other witnesses. This evidence made a prima facie showing, and allowed the jury to reasonably determine, that defendant was the person who sent the messages to Jane. Any inference that the messages came from persons other than defendant concerned the messages' weight, not their admissibility.

Second, defendant claims his criminal threats convictions in counts 5 *and* 8 must be reversed because making a criminal threat is a lesser included offense of stalking, and a person cannot be convicted of both a greater offense and a necessarily included lesser offense. Defendant also claims his stalking and criminal threats convictions are separate statements of the same offense and violate the double jeopardy clause of the Fifth Amendment, because his criminal threats convictions are necessarily included in his stalking conviction. All of these claims lack merit. Defendant was properly convicted of stalking in count 1 and making criminal threats in counts 5 and 8.

Third, defendant claims the court erroneously failed to stay, under section 654, his sentence on his criminal threats convictions in counts 5 and 8, and his convictions for violating restraining orders in counts 3, 6, 7, and 9, because these convictions arose from the same indivisible course of conduct, and were based on the same intent and objective,

3

as his stalking conviction—namely, his threats to harm Jane and his attempts to convince Jane to resume his and Jane's romantic relationship between April and August 2016. We reject this claim because substantial evidence supports the court's implicit finding that defendant's convictions in counts 3, 5, 6, 7, 8, and 9 were based on distinct acts, occurring on separate days and thus divisible in time. Thus, separate punishment was properly imposed on each of these convictions.

Fourth and lastly, the parties agree, as do we, that the judgment must be modified to strike defendant's one-year prison prior enhancement (§ 667.5, subd. (b)), in light of the October 8, 2019 enactment of Senate Bill No. 136 (2019-2020 Reg. Sess.), which applies retroactively to all judgments, including defendant's judgment, which were not final on appeal when the legislation went into effect on January 1, 2020. Thus, we modify the judgment to strike the one-year prison prior, which reduces defendant's sentence from six years four months to five years four months. In all other respects, we affirm the judgment.

## II. FACTS AND PROCEDURAL HISTORY

### A. *The Three Criminal Protective Orders Against Defendant*

Defendant and Jane dated for several months, beginning in 2015. Several times, either Jane or defendant broke off their relationship, but then the two of them would reconcile. Between August and October 2015, Jane obtained three restraining orders against defendant, and despite these orders, Jane and defendant reunited and broke up several more times between December 2015 and April 18, 2016. On March 10, 2016, Jane obtained three criminal protective orders against defendant when he pled guilty to

4

violating the three restraining orders. The criminal protective orders were in effect until March 10, 2019.

B. *The April 2016 Phone Calls and Text Messages to Jane and R.M.*

On April 18, 2016, Jane decided she wanted to permanently end her relationship with defendant. After April 18, Jane tried to avoid defendant; she did not answer his calls or reply to his text messages. Jane lived with her father, R.M., and her five children. On April 18, Jane reported to police that defendant had violated the March 10, 2016, criminal protective orders by calling her home phone multiple times on April 18, and by sending her text messages on April 14, 15, and 17 from phone numbers she did not recognize. In these calls and text messages, defendant kept telling Jane he loved her and wanted her back.

Jane recorded defendant's last phone call to Jane's home phone on April 17, 2016, which R.M. answered, and the recording was played for the jury. In April 2016, defendant also called R.M. on R.M.'s cell phone, and R.M. told defendant to stop calling Jane. R.M. did not know how defendant obtained R.M.'s phone number. Defendant also sent several text messages to R.M.'s cell phone, calling Jane a "bitch," a "whore," and a "sex maniac," claiming Jane was "fucking" defendant's uncle, and saying that Jane would "'see what's coming to her'" and would "regret it for the rest of her life."

C. *The Home Depot Incident* (*June 20, 2016*) (*Counts 2-4*)

On June 20, 2016, Jane saw defendant waiting for her as she was arriving for work at a Home Depot store where she had been working since January 2016. Jane told defendant to leave or she would call the police, but defendant followed her into the store,

5

yelled at her, and threatened to vandalize her car unless she agreed to get back together with him. A store surveillance camera, which video-recorded the encounter between Jane and defendant, was played for the jury.

After defendant refused to leave, Jane reported defendant to two coworkers and her supervisor. Jane asked one of the coworkers, E.L., to move her car closer to the front of the store because she feared defendant would vandalize it and she feared going outside. E.L. waited until he thought defendant had left the store parking lot, then got into Jane's car to move it. Defendant then appeared in front of the car and threw a boulder, the size of a bowling ball, through the front windshield of the car. E.L. shifted to the left to avoid the boulder and got out of the car. Had E.L. not moved, the boulder would have hit him. Defendant then shattered the rear window and a side window of the car with other boulders he took out of his backpack.

A bystander tried to "de-escalate" the situation by confronting defendant, who then brandished another rock to keep E.L. and the bystander from approaching him. Defendant was saying, "'I'll kill you. I'll throw the rock. I'll kill you'" to keep E.L. and the bystander away from him. Defendant then ran away, dropped the rock, and got on a bus. The bystander called 911 to report the incident, and a recording of the 911 call was played for the jury.

The police arrived at the Home Depot store after the store manager placed a 911 call, which was also played for the jury, in which the store manager and Jane reported that defendant had accosted Jane in violation of a protective order and had vandalized her

6

car.  Repairs to fix the car windows cost Jane over $600.  The incident made Jane fear defendant.

D.  *The July 2016 Texts to Jane Through Facebook Messenger*

Jane called the police on July 6, 2016, reporting numerous violations of the three criminal protective orders by defendant during the preceding days.  Jane reported that defendant had sent her various threatening text messages through Facebook Messenger, using fictious names or pseudonyms and "fake" Facebook accounts.  Jane would block one Facebook sender, then the text messages would come to her through a new Facebook sender.[5]

1.  <u>The Facebook Text Messages from "Emilio Lopez"</u>

Using the name "Emilio Lopez," defendant sent several text messages to Jane between June 20 and July 6, 2016.  One series of text messages from "Emilio Lopez," which Jane received between July 1 and July 6, 2016, said:  "Cut the crap [Jane] and don't get yourself in trouble.  Hope to God that you don't get me in a bad mood because then you will regret everything.  This better be the last time you see your little boyfriend because if it's not the last time next time you'll know and that also go[es] for Luis.  Behave and listen.  [¶]  Please listen."  Jane testified that Luis was a friend of Jane's and of defendant's uncle, and that defendant believed Jane was having a sexual relationship with Luis.

---

[5]  Jane also showed a police detective that defendant was using a photograph of a gun with bullets as his own Facebook profile.

In another series of text messages from "Emilio Lopez," defendant wrote: "This is the last chance I'm giving [if not well you know] [¶] Poor you if I find you're still fucking Luis poor you [¶] You give them ass give it to me too [come] over so we can fuck [¶] Why them and not me? You don't even think twice to give up your ass to your handsome so tell me then what did your handsome do the day of the car you should have called him and told him hey they broke my windows help me like the I give you ass. You're fucking sick in the head have some respect and don't be a slut."[6] Jane testified she received these text messages after June 20, 2016, the day defendant broke Jane's car windows, and before July 6, 2016, the day Jane showed the text messages to a police detective.

The text messages from "Emilio Lopez" continued: "I'm sure he fucked you and in [M]arch I'm here crying fucking crocodile tears but just how you played me you'll pay for all of it SO THINK ABOUT WHAT YOU'RE DOING." Along with these text messages, defendant sent Jane screenshots of text messages sent between Luis and Jane. Jane testified she recognized the text messages between herself and Luis, and she believed defendant obtained the text messages through Apple because she and defendant had purchased iPhones using the same account.

In further text messages from "Emilio Lopez," defendant said: "DREAM OF ME FRIEND GOODBYE CUTIE [¶] You're not going to tell me HOW DELICIOUS? [¶] You know he's always going to be there cutie [¶] Tell them to help you tell them to take

---

[6] All quotes of text messages, e-mails, and other correspondence, including brackets and parentheses, are directly from the record.

the load off you see stupid that no one will stick their hands in flames for you ahhh but you're real good at giving them pussy  [¶]  Think about it well because next time I won't forgive you and you won't laugh at me that I promise you  [¶]  REMEMBER REAL GOOD HOW MANY TIMES I ASKED YOU IF YOU WERE REALLY REALLY SURE ABOUT GETTING BACK WITH ME THE TIME YOU CALLED ME TO MEXICALI CRYING.  DIDN'T I ASK YOU ABOUT 6 TIMES IF YOU'RE REALLY SURE!  And look I yelled at you on Christmas and look at what you do to me after all you did to me after all you were doing it to me behind my back I knew what was going on but a lot of the times I endured it because I love you and tell me if I'm the bad one  [¶]  Enjoy your last day with your Joey if he's here because I swear it will be  [¶]  *When can we fuck in my uncle's apartment so we can bring back old memories*?" (Italics added.) Jane testified that she and defendant had been intimate in defendant's uncle's apartment, but she had never been intimate with anyone else in the apartment.

The text messages from "Emilio Lopez" continued:  "Maybe if I would have treated you like a fucking prostitute and I didn't care for you and you were just good for fucking I think we would still be together but I gave you the respect you deserve as a woman and a mother.  [¶]  If you wanted it so much even if we weren't together I would treat you the same.  Now why don't you come and give it to me why do you look for them I can fuck you like them and send you your way after I'm done  [¶]  Afterwards I can tell you I'll always be there for you my cutie with that should be enough  [¶]  Even Luis said that you Have no limit  [¶]  Look fucking asshole  [¶]  I would always pretend like nothing happened, I waited and waited for you to change there were times I would

9

pray at night for you to change.  [¶]  And tell me if I'm the bad one  [¶]  You crossed the line give me ass yes  [¶]  I want you to behave not like a fucking slut because even if I struggle and struggle I'll take you out of that road  [¶]  I was good to you even knowing a lot of things on you  [¶]  Goodnight  [¶]  That's how yours is going to be."  Under the line, "That's how yours is going to be," defendant attached a photograph of a severed and bloody human ear.  Jane understood this as a threat.

### 2.  The Facebook Messages from "Henry Hall"

In another series of Facebook messages to Jane from "Henry Hall," which Jane received between July 1 and 6, 2016, defendant wrote:  "I'm going to make your life a living hell you fucking bitch you'll see what's coming your way you fucking bitch I'm going to cut your ear so you can remember me your whole life and if you leave you have your fucking father here."  Defendant re-sent this message to Jane, three or four times.

The text messages from "Henry Hall" continued:  "I promise you I'll do it you know what I'm capable of bitch  [¶]  But first I'm going to give you a good beating one day when you get off work  [¶]  I'm going to close your eyes [with pure punches], just so you know what you're expecting [bitch]  [¶]  Go suck Rolando's dick from Clinton St."  Jane testified that Rolando was the name of defendant's uncle.  The text messages from Henry Hall continued:  "Rolando says you suck dick real good when he says slut he's referring to you  [¶]  You have no idea what is waiting for you."  Defendant then texted an "emoji" symbol of a skull and crossbones.

10

### 3. The Facebook Messages from "Adrian Munoz"

Jane testified that she had a brother named "Adrian Munoz," and that defendant knew this. In early July 2016, Jane received several text messages, through Facebook Messenger, from someone claiming to be "Adrian Munoz." These text messages began: "Hello little slut don't act that way [¶] Or do you want me to fuck you up today after work [¶] Behave." These text messages were accompanied by the same screenshot of the text messages between Jane and Luis that had been included in the previous text messages from "Emilio Lopez."

The text messages from defendant as "Adrian Munoz" continued: "How come you give them ass and I have to beg for it [¶] Please don't make me mad or else I'll go to your job today [¶] Take care gorgeous [¶] Am I not your handsome anymore?" Jane testified that, in the comment, "Am I not your handsome anymore?," defendant was sarcastically referring to Luis, because Jane had referred to Luis as "handsome" on Facebook.

In further text messages from "Adrian Munoz," defendant said: "Report me and see what happens [¶] Look what Rolando Sanchez is saying about you 'the fucking slut sucks dick good.'" "Do you remember the day of the 10 dollar bill inside your car right [¶] That day I marked it with a pen and I sent him for the 12 pack of beers and he took about an hour to come back and I found that exact bill inside your car [¶] Just so you know just so you know [¶] TOMORROW MORNING I AM GOING TO WANT PUSSY AND IF YOU DON'T COME I'LL GO LOOK FOR YOU AT YOUR JOB TO GIVE YOU A GOOD BEATING [¶] You'll see what will happen[] after work if you

11

don't come." Jane understood this to mean that defendant was going to look for her after she left work to beat her up.

    4.  The Facebook Messages from "Mike Jones"

Jane testified defendant often referred to himself in the third person as "El Yiyo" and "Mario." Defendant would say the "good guy" was Mario and the "bad guy" was El Yiyo. "El Yiyo" was the one who "harmed" Jane, and "Mario" was the one who loved Jane. On July 23, 2016, Jane reported to police that defendant sent her text messages on July 23, through Facebook Messenger, under the name "Mike Jones."

In the text messages from "Mike Jones," defendant said, "You very well know that was not me it was el yiyo you very well know that el amrio (Mario) loves you with all his heart [¶] Sorry for what happened but it wasn't me you know very well who it was[.] Mario will marry you it's up to you [¶] I'll marry you my love." The next text message stated: "And [I']m sorry [I] really am[,]" just above a photograph of Jane's car taken at the Home Depot on June 20, 2016, the day defendant smashed the windows of Jane's car. Jane understood defendant to be saying that El Yiyo, not defendant, had damaged the car. The text messages from "Mike Jones" continued: "Do you think it didn't hurt me when you said that you were sleeping with him [¶] Are you behaving bitch [¶] [Y]ou better be behaving bitch." The text messages from "Mike Jones" then asked Jane to meet defendant in Indio so that he could show Jane how much he loved her. Jane did not respond to any of these messages.

E. *Defendant's Further Communications to Jane* (*July & August 2016*)

On July 1, 2016, Jane received two e-mails from defendant through defendant's own iCloud e-mail account. Jane was with defendant when he set up this e-mail account. The first e-mail from this account said: "You're the one that I love [Jane], you are." The second e-mail said: "I don't care how many times you reject me, what you say, what you say, this time I'm not going to lose you."

Jane recorded a July 5, 2016, phone call from defendant in which defendant said he would beat Jane if she did not meet him that night. The recording of this call was played to the jury. On July 6, Jane and defendant's mutual friend, M.M., gave a sheriff's deputy copies of text messages that defendant had sent to M.M. in which defendant told M.M. he thought Jane was having an affair with defendant's uncle, and that defendant would cut off Jane's ears.

On July 24, 2016, defendant called Jane, yelled at her, and told her he was going to come to her house to "get" her. On July 25, 2016, defendant sent Jane a text message through the application, "WhatsApp," saying: "Really daughter of your whore mother [¶] And now who is going to save you from this one?" Jane understood the message as a threat to beat her.

On July 26, 2016, defendant called Jane several times, threatening to "beat the crap" out of her and her father if she did not meet with him. During these calls, defendant also said he had driven by Jane's house, that he had thrown "three cans of beer" at Jane's car, and told Jane to keep the window to her room open. Defendant sent Jane a text message on July 26, 2016, telling Jane to look for the "smashed" beer cans,

13

that he had been "there" outside her house at 4:10 p.m., and saying, "Don't be acting stupid bitch." Later on July 26, Jane found three beer cans near her car, which was parked outside her home; Jane also saw that beer and food had recently been thrown on her car. Jane called the police dispatch on July 26 and reported defendant had been calling and threatening to beat the crap out of her until she bleeds. A recording of Jane's dispatch call was played for the jury.

On July 27, 2016, defendant called Jane and asked her if she had "called the cops." Jane did not answer defendant's question, and either Jane or defendant hung up the phone. On July 28, Jane reported to the police that defendant had sent her more text messages on July 26, telling Jane that sheriff's deputies had been looking for him where he lived and he hoped that the deputies had not come on Jane's behalf.

Defendant sent Jane several additional text messages on August 3, 2016, saying, among other things, that, "I want my watch [ASAP] Because I'll go and look for you at your house so that you know who is the Yiyo. [¶] . . . [¶] The other time I went and took out the air from the tires of your car was a warning [¶] . . . [¶] Wherever you are I will look for you in the computer and I will go look for you I promise. Love you [¶] . . . [¶] You know what will happen to you if you go tomorrow think of your dad." Jane understood these text messages to mean defendant was going to hurt her, that he would continue to stalk and harass her, and that he was also threatening to hurt her father.

Following unsuccessful attempts to locate defendant in late July 2016, sheriff's deputies located and arrested defendant in August 2016.

14

F.  *The Four Prior Domestic Violence Incidents* (*Admitted Under Evid. Code,* *§ 1109*)

The prosecution adduced evidence of four prior uncharged incidents involving domestic violence by defendant against Jane. (Evid. Code, § 1109.)  One incident occurred on August 15, 2015, when defendant showed up at a casino where Jane was employed and tried to give her flowers, despite the temporary domestic violence restraining order then in place.

A second incident occurred in early October 2015.  On October 9, Jane reported to police that, on October 8, defendant left a handwritten letter on her front door, warning her that "things are going to go down south" if she did not go to his house within 24 hours.  Defendant also left Jane 53 text messages threatening Jane and her father.

A third incident occurred on October 30, 2015, when Jane's neighbor informed her that defendant was outside her house late at night, taking photographs of her house in violation of the restraining order then in place.  Fourth and lastly, the prosecution adduced evidence that defendant had a 2009 conviction for attempted aggravated assault in Arizona.

## III.  DISCUSSION

A.  *The Prosecution Adequately Authenticated the Facebook Messages Supporting Defendant's Criminal Threats Conviction in Count 5*

Defendant claims his criminal threats conviction in count 5 must be reversed because the court abused its discretion in allowing the prosecution to adduce, in support of count 5, Facebook messages that the prosecution claimed defendant sent to Jane

15

through Facebook Messenger, using fictitious names. Defendant claims the prosecution failed to adduce sufficient evidence to authenticate the messages as having been sent by defendant, rather than by someone else.[7]

We conclude the prosecution adduced sufficient proof of the challenged Facebook messages' authenticity. The messages' contents, together with the testimony of Jane and other witnesses, made a prima facie showing, and thus allowed the jury to reasonably determine, that defendant was the person who sent the messages to Jane.

### 1. Relevant Background

Before trial, defense counsel objected to the admission of electronic messages that the prosecution claimed defendant sent to Jane, under fictitious names, through Facebook Messenger. Defense counsel claimed the prosecution could not lay an adequate foundation establishing that defendant was the person who sent the messages to Jane because the prosecution had not subpoenaed records from Facebook showing that defendant was the person who opened the Facebook accounts under the names from which the messages were sent. Defense counsel noted that the messages had no dates or times on them and could have been sent by other persons, including men whom Jane was seeing around the time the messages were sent.

The court ruled that the Facebook messages were admissible and that defense counsel's arguments concerned the weight, not the admissibility, of the messages. At trial, the prosecution adduced numerous Facebook messages that Jane received between

---

[7] Defendant does not challenge his criminal threats conviction in count 8 on the ground it was based on unauthenticated Facebook messages.

June 20 and July 6, 2016, which are described in detail above and which came from "Emilio Lopez," "Henry Hall," "Adrian Munoz," and "Mike Jones."

In closing argument, the prosecutor argued count 5 was based on the Facebook messages from "Henry Hall," promising to cut off Jane's ear, to beat Jane when she got off work by "clos[ing]" her eyes with "pure punches," and including an emoji of a skull and crossbones. The prosecutor also referenced the Facebook messages from "Emilio Lopez," saying "That's how yours is going to be" above a photograph of a severed, bloody ear, and which accused Jane of having a sexual relationship with Luis and included screenshots of text messages between Jane and Luis. The prosecutor also referred to the evidence that, before July 6, 2016, defendant sent text messages from his phone to (1) his and Jane's mutual friend, M.M., in which he told M.M. he was going to cut off Jane's ears; and (2) R.M., in which he said Jane would "'see what's coming to her.'"

### 2. Applicable Law and Standard of Review

"Authentication of a writing . . . . is required before it may be admitted in evidence. ([ Evid. Code,] §§ 250, 1401.) Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined [as relevant here] as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' . . . . (§ 1400.)" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) "[W]hat is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible.'" (*Id*. at p. 267.)

17

Thus, a writing can be authenticated if its proponent adduces evidence sufficient to make a prima facie showing that the writing is what its proponent claims it is, or, in other words, that the writing is, "genuine for the purpose offered." (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.) Conflicting inferences regarding the writing's authenticity go to the weight of the writing as evidence, not its admissibility. (*Ibid*.) "'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'" (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.)

Except as provided by statute, the testimony of a subscribing witness is not required to authenticate a writing (Evid. Code, § 1411), and there are no limits on the means by which a writing may be authenticated. (Evid. Code, § 1410 ["Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved."].) Rather, a writing may be authenticated by its contents and circumstantial evidence, including the testimony of witnesses *other than* the person or persons who created the writing or witnessed its creation. (*Goldsmith*, *supra*, 59 Cal.4th at p. 268; *People v. Landry* (2016) 2 Cal.5th 52, 87.) A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. (*Goldsmith*, *supra*, at p. 266.)

18

3. Analysis

The court did not abuse its discretion in ruling that the prosecution made a sufficient prima facie showing that the Facebook messages to Jane from "Emilio Lopez" and "Henry Hall" were what the prosecution claimed they were—Facebook messages sent to Jane *by defendant*, using the fictitious names "Emilio Lopez" and "Henry Hall." Based on the messages' content and the testimony of Jane, M.M., and R.M., the jury reasonably could have concluded that the messages were from defendant.

In text messages to M.M. from defendant's phone, defendant told M.M. he was going to cut off Jane's ears, and in other text messages to R.M., defendant said Jane was going to "'see what's coming to her.'" The Facebook messages to Jane from both Henry Hall and Emilio Lopez threatened to cut off Jane's ear. The messages from Henry Hall also accused Jane of having a sexual relationship with "Luis" and included screenshots of text messages exchanged between Jane and Luis, which Jane testified defendant could have obtained because she and defendant had set up iPhones together using the same account. The messages from Emilio Lopez also asked Jane about having sexual relations "in my uncle's apartment," and Jane testified that she and defendant had been intimate in the uncle's apartment, but she had never been intimate with anyone else in the uncle's apartment. All of this evidence made a prima facie showing and thus allowed the jury to reasonably determine that the messages to Jane from "Henry Hall" and "Emilio Lopez" were from defendant.

19

Relying on *People v. Beckley* (2010) 185 Cal.App.4th 509, defendant argues that the Facebook messages from Henry Hall and Emilio Lopez were insufficiently authenticated because no expert or "independent" testimony was offered to authenticate them. In *Beckley*, the defendant's girlfriend provided alibi testimony on the defendant's behalf and denied that she, the girlfriend, associated with a gang. (*Id.* at p. 516.) To impeach the girlfriend, the prosecution proffered a photograph, purportedly showing the girlfriend "flashing" a gang sign, together with an investigator's testimony that the photograph had been downloaded "from Beckley's home page on the Internet Web site MySpace." (*Id.* at p. 514.) Although it was undisputed that the face in the photograph was the girlfriend's, *Beckley* held that, absent expert testimony that the photograph had not been "doctored" and precluding the possibility that the defendant's MySpace page had been "hacked," the trial court erred in concluding that the photograph was adequately authenticated. (*Id.* at pp. 514-515.)

*Beckley* reasoned: "[N]o expert testified that the picture was not a '"composite"' or '"faked"' photograph," and cautioned that "[s]uch expert testimony is even more critical today to prevent the admission of manipulated images . . . . Recent experience shows that digital photographs can be changed to produce false images. [Citation.] Indeed, with the advent of computer software programs such as Adobe Photoshop 'it does not always take skill, experience, or even cognizance to alter a digital photo.' [Citation.] '. . . No web-site is monitored for accuracy and *nothing* contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover,

20

the Court holds no illusions that hackers can adulterate the content of *any* web-site from *any* location at *any* time.'" (*People v. Beckley*, *supra*, 185 Cal.App.4th at pp. 515-516.)[8]

For purposes of this appeal, it is sufficient to note that *Beckley* is distinguishable on its facts. Here, we are not concerned with the authentication of a *photograph of a person doing something*, such as flashing a gang sign, and the possibility that the photograph was faked. Rather, we are concerned with whether the prosecution made a prima facie showing that the Facebook messages to Jane from "Henry Hall" and "Emilio Lopez" were sent by defendant. The questions concerning the accuracy and reliability of these Facebook messages differ from the questions concerning the accuracy and reliability of the photographic evidence presented in *Beckley*.

As we have noted, the Facebook messages to Jane from "Henry Hall" and "Emilio Lopez" included content that defendant communicated to Jane and others by means other than the Facebook messages themselves (e.g., defendant's text message to M.M., from defendant's phone, saying he was going to cut off Jane's ears). In addition, the messages

_____

**8** At least one court has criticized *Beckley* as mistakenly equating authentication with proving genuineness. The court in *In re K.B.* (2015) 238 Cal.App.4th 989, at page 997, observed that, "reading *Beckley* as equating authentication with proving genuineness would ignore a fundamental principle underlying authentication emphasized in *Goldsmith*. In making the initial authenticity determination, the court need only conclude that a prima facie showing has been made that the photograph is an accurate representation of what it purports to depict. The ultimate determination of the authenticity of the evidence is for the trier of fact, who must consider any rebuttal evidence and balance it against the authenticating evidence in order to arrive at a final determination on whether the photograph, in fact, is authentic. As our Supreme Court explained in *Goldsmith*, '[t]he fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.] (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)"

included things defendant knew about or had access to, independently of the messages themselves (e.g., the text messages exchanged between Jane and Luis, and the fact that defendant and Jane had had sexual relations in defendant's uncle's apartment). This circumstantial evidence, coupled with the contents of the messages, made a prima facie showing that the Facebook messages to Jane were sent by defendant.

B. *Defendant Was Properly Convicted of Stalking* (*Count 1*) *and Making Criminal Threats* (*Counts 5 & 8*)

Defendant claims his criminal threats convictions (§ 422) in counts 5 and 8 must be reversed because they are based on "the same conduct" as his stalking conviction in count 1 (§ 646.9, subd. (b)). We disagree.

### 1. Counts 1, 5, and 8 Are Not Lesser Included Offenses of Each Other

"'[I]t is generally permissible to *convict* a defendant of multiple charges arising from a single act or course of conduct. (§ 954; *People v. Ortega* (1998) 19 Cal.4th 686, 692 . . . .) However, a "judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses."'" (*People v. Delgado* (2017) 2 Cal.5th 544, 570.)

"'In deciding whether multiple conviction is proper, a court should consider only the statutory elements.' (*People v. Reed* (2006) 38 Cal.4th 1224, 1229 . . . .) 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.' (*Id.* at p. 1227.) In other words, "'[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former."'"

22

(*Ibid.*, quoting *People v. Lopez* (1998) 19 Cal.4th 282, 288 . . . .)" (*People v. Delgado, supra,* 2 Cal.5th at p. 570.)

We review de novo a claim that a conviction is barred because it is necessarily included in another conviction. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474.) Defendant was properly convicted of stalking in count 1 (§ 646.9, subd. (b)) and of making criminal threats in counts 5 and 8 (§ 422). Under the statutory elements test, making a criminal threat is not a necessarily included lesser offense of stalking, nor is stalking a necessarily included lesser offense of making a criminal threat.

The "credible threat" element of stalking differs from the threat element of making a criminal threat. Stalking requires the defendant to willfully make a "credible threat" with the intent to place the victim in reasonable fear for the victim's safety or for the safety of the victim's immediate family. (§ 646.9, subd. (a);[9] CALCRIM No. 1301.) But making a criminal threat requires the defendant to "willfully threaten to commit a crime which will result in death or great bodily injury to another person . . . ." (§ 422; CALCRIM 1300.)[10] Stalking also requires the defendant to "willfully, maliciously, and

_____

[9] Although defendant was convicted of violating section 646.9, subdivision (b)—stalking Jane when there was a court order in effect prohibiting defendant from contacting Jane—the offense of stalking is defined in section 646.9, subdivision (a). Subdivisions (b), (c)(1) and (2) of section 646.9 describe "penalty provisions triggered when the offense of stalking as defined in subdivision (a) of [section 646.9] is committed by a person with a specified history of misconduct." (*People v. Muhammad* (2007) 157 Cal.App.4th 484, 494.)

[10] The jury was instructed accordingly.

23

repeatedly follow[] or willfully and maliciously harass[]" the victim. (§ 646.9, subd. (a).) But a criminal threat does not require the defendant to "repeatedly follow" or "harass" the victim. (§ 422.)

Thus, a defendant can commit stalking without making a criminal threat. If the defendant threatens the victim with the intent to place the victim in reasonable fear for either the victim's safety or the safety of the victim's immediate family, *but the threat does not include a threat of great bodily injury or death*, and the defendant satisfies the other elements of stalking, then the defendant commits stalking but does not commit a criminal threat. A defendant can also make a criminal threat without committing stalking if the defendant threatens the victim with great bodily injury or death but does not willfully or maliciously repeatedly follow or harass the victim.

2. Counts 1, 5, and 8 Are Not Separate Statements of the Same Offense

Defendant also points out that section 954 prohibits "'multiple convictions for a different statement of the same offense when [the convictions are] based on the same act or course of conduct.'" (*People v. Vidana* (2016) 1 Cal.5th 632, 650; cf. *People v. Muhammad*, *supra*, 157 Cal.App.4th at p. 490 ["Multiple convictions *can* be based on a single criminal act, if the charges allege *separate offenses*." (Italics added.)].) Defendant argues his criminal threats convictions in counts 5 and 8 must be reversed because the prosecution urged the jury to conclude he satisfied the "credible threat" element of the stalking charge by making the criminal threats charged in counts 5 and 8. Thus, he argues, his criminal threats convictions are necessarily included in his stalking conviction, and for this reason must be reversed. We disagree.

24

Convictions for separate offenses cannot be "different statements of the same offense" unless the offenses *can be committed and are committed* by the same conduct. Stalking and making a criminal threat cannot be different statements of the same offense, because stalking cannot be based solely on the making of a criminal threat, given that stalking also requires the defendant to willfully or maliciously either repeatedly follow or harass the victim. (§ 646.9, subd. (a); cf. *People v. Vidana*, *supra*, 1 Cal.5th at pp. 647-649 [because larceny and embezzlement are different statements of the same offense, a defendant cannot be convicted of both based on the same conduct]; *People v. Brunton* (2018) 23 Cal.App.5th 1097, 1107 ["[W]hen based on a defendant's single act of using a noninherently dangerous object in a manner likely to produce great bodily injury, section 245[, subdivision] (a)(1) and (4) are merely different statements of the same offense such that the defendant may not be convicted of violating both subparts of the subdivision."].)

Thus, even if the jury based the "credible threat" element of defendant's stalking conviction on the evidence that defendant made a criminal threat as charged in count 5, count 8, or both, it does not follow that defendant's stalking conviction is a different statement of the same offense as either of his two criminal threats convictions. As noted, to convict defendant of stalking, the jury also had to find that defendant "willfully" or "maliciously" either "repeatedly follow[ed]" or "harass[ed]" Jane. (§ 646.9, subd. (a).)

Further, the record does not support defendant's claim that the jury must have based the "credible threat" element of the stalking charge in count 1 on the same acts underlying the criminal threats charges in counts 5 and 8. First, the information alleged in count 5 that defendant committed criminal threats against Jane "on or about 7/4/2016,"

25

and alleged in count 8 that defendant committed criminal threats against Jane "on or about 7/26/2016." For the stalking charge, the information alleged that defendant violated section 646.9, subdivision (b), "in that on or about April 2016-August 2016. . . . [he] did willfully, unlawfully, maliciously, and repeatedly follow and harass Jane Doe, *and make a credible threat* with the intent to place Jane Doe in reasonable fear of Jane Doe's safety and the safety of Jane Doe's immediate family . . . ." (Italics added.) Thus, the offenses charged in counts 1, 5, and 8 were not necessarily based on the same alleged acts.

Additionally, in closing argument, the prosecutor did not urge the jury to base the credible threat element of the stalking charge in count 1 on the same conduct underlying the criminal threats charges in counts 5 and 8. Rather, the prosecutor argued that the "credible threat" element of the stalking charge was satisfied by the Facebook messages defendant sent to Jane between July 1 and 6, 2016, using the name "Adrian Munoz" and threatening to beat up Jane after she got off work that day. For the criminal threat charge in count 5, the prosecutor argued that the Facebook messages Jane received between July 1 and 6, 2016, from "Henry Hall," threatening to cut off Jane's ear, and from "Emilio Lopez," sending Jane a picture of a severed, bloody ear, satisfied count 5. For the criminal threat charge in count 8, the prosecutor argued that defendant's July 26, 2016, phone calls to Jane, threatening to "beat the crap" out of Jane and her father if Jane did not meet with defendant, satisfied count 8.

To be sure, the prosecutor argued to the jury that as many as eight "acts" satisfied the "continuous conduct" element—that is, the "repeatedly following" or "harassing" element—of the stalking charge, and one of these acts ("Act 6") was defendant's July 26, 2016, phone calls to Jane. But the prosecutor also noted that only two acts were necessary to satisfy the continuous conduct element, and the jury could have based the continuous conduct element on any two acts *other than* the defendant's Facebook messages using the names "Henry Hall" and "Emilio Lopez," and defendant's July 26, 2016, phone calls, which the prosecutor urged the jury to rely on in convicting defendant of the two criminal threats charges. For example, the jury could have based the continuous conduct element of the stalking conviction on defendant's July 1 to 6, 2016, Facebook messages from "Adrian Munoz," together with defendant's April 18, 2016, phone calls and text messages, defendant's July 1, 2016, e-mails, and defendant's July 5, 2016, phone calls.

Relying on *People v. Kelley* (1997) 52 Cal.App.4th 568, defendant also claims his criminal threats convictions are barred by the double jeopardy clause of the Fifth Amendment. "The double jeopardy clause prohibits an individual from being tried twice for the same offense or any included offense. In the case of an included offense, it matters not whether the greater or lesser offense was tried first. [Citation.] The test is whether each offense contains an element the other does not." (*People v. Kelley*, at p. 576.) This claim fails because, for the reasons explained, the stalking and criminal threats charges are neither lesser included offenses of each other under the statutory

elements test, nor are they different statements of the same offense on the facts of this case.

C. *The Court Did Not Erroneously Fail to Stay Imposition of Sentence on Defendant's Two Criminal Threats Convictions* (*Counts 5 & 8*) *and His Four Convictions for Violating Criminal Protective Orders* (*Counts 3, 6, 7, & 9*)

The court imposed the upper term of four years on defendant's stalking conviction in count 1, a consecutive eight-month term (one-third the middle term) on his criminal threats conviction in count 5 (§ 422), a concurrent, two-year term on his criminal threats conviction in count 8 (§ 422), and concurrent two-year terms on each of his convictions in counts 3, 6, 7, and 9 for violating criminal protective orders.[11] (§ 273.6, subd. (d).)

Defendant claims the court erroneously failed to stay imposition of the sentences on his two criminal threats convictions (counts 5 & 8) (§ 422), and his four convictions for violating the criminal protective orders (counts 3, 6, 7, & 9) (§ 273.6, subd. (d)), because these convictions were based on "the same course of conduct as the stalking offense," (§ 646.9, subd. (b)), and because all of defendant's acts were incident to the single purpose and objective of persuading Jane to resume her relationship with defendant. This claim lacks merit because substantial evidence supports the court's implied finding that defendant's convictions in counts 3, 5, 6, 7, 8, and 9 were based on separate acts, occurring on separate days.

_____

[11] See footnote 4, *ante*.

28

1.  Applicable Law and Standard of Review

Section 654 provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

"Although section 654 literally applies only where multiple statutory violations arise out of a single 'act or omission,' it has also long been applied to cases where a 'course of conduct' violates several statutes.  [Citations.]  A 'course of conduct' may be considered a single act within the meaning of section 654 and therefore be punishable only once, or it may constitute a 'divisible transaction' which may be punished under more than one statute."  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.)

"[T]he basic test used for determining whether a 'course of conduct' is divisible was stated in *Neal* [*v. State of California* (1960) 55 Cal.2d 11 at page 19 ] as follows: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"  (*People v. Kwok*, *supra*, 63 Cal.App.4th at p. 1253.)

"But decisions since *Neal* have refined and limited application of the 'one intent and objective' test, in part because of concerns that the test often defeats its own purpose because it does not necessarily ensure that a defendant's punishment will be commensurate with his culpability.  [Citation.]  . . . [I]n *People v. Beamon* [(1973)

8 Cal.3d 625] at page 639, the Supreme Court stated that protection against multiple punishment under section 654 applies to 'a course of conduct deemed to be *indivisible in time*.' (Italics added.) The court added in a footnote: 'It seems clear that a course of conduct *divisible in time*, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' (*People v. Beamon*, *supra*, fn. 11, italics added.) Thus, a finding that multiple offenses were aimed at one intent and objective does not necessarily mean that they constituted 'one indivisible course of conduct' for purposes of section 654. If the offense were committed on different occasions, they may be punished separately." (*People v. Kwok*, *supra*, 63 Cal.App.4th at p. 1253.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) The court's express or implied findings in support of its determination that section 654 does not apply will be upheld on appeal if substantial evidence supports them. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

    2. Analysis

Substantial evidence supports the court's implied finding that the convictions in counts 1, 3, 5, 6, 7, 8, and 9 were based on separate, distinct acts. As the People argue, "there were so many instances of [defendant]'s communications and threats . . . that the trial court could have based [defendant]'s sentence[s] [in counts 1, 3, 5, 6, 7,8, and 9] on a myriad . . . of those acts for each count without any overlap."

*Count 1*: As discussed, the prosecutor urged the jury to conclude, and substantial evidence shows, that the credible threat element of defendant's stalking conviction is based on the Facebook messages that defendant sent to Jane in early July 2016, using the name "Adrian Munoz," and threatening to beat up Jane after she got off work that day. Substantial evidence also shows that the continuous conduct element, or the "repeatedly follow" or "harass" element, of the stalking conviction is based on the Facebook messages from "Adrian Munoz," together with any one of several additional harassing acts, including defendant's April 18, 2016, phone calls to Jane and her father, R.M., defendant's April 18, 2016 text messages to Jane, defendant's July 1, 2016, e-mails to Jane, and defendant's July 5, 2016, phone calls to Jane.

*Counts 5 and 8*: Substantial evidence also shows that defendant's criminal threats conviction in count 5 is based on the Facebook messages Jane received, between July 1 and 6, 2016, from "Henry Hall," threatening to cut off Jane's ear, and from "Emilio Lopez," sending Jane a picture of a severed, bloody ear. Substantial evidence shows that defendant's criminal threat conviction in count 8 is based on defendant's July 26, 2016, phone calls to Jane, threatening to "beat the crap" out of Jane and her father if Jane did not meet with defendant.

*Counts 3, 6, 7, and 9*: Substantial evidence shows that defendant's convictions in counts 3, 6, 7, and 9, for violating the March 10, 2016, criminal protective orders are based on different acts than his stalking and criminal threats convictions. The prosecutor urged the jury to conclude, and substantial evidence shows, that count 3 is based on

31

defendant's act of contacting Jane at the Home Depot on June 20, 2016; count 6 is based on the Facebook messages from Henry Hall—not the messages threatening to cut off Jane's ear, which support count 5, but the subsequent messages from Henry Hall threatening to beat up Jane when she got off work and close her eyes with "pure punches"; count 7 is based on defendant's July 24, 2016, phone calls to Jane telling her he was coming to her house to "get her"; and, lastly, count 9 is based on defendant's July 26, 2016, text messages to Jane, calling Jane the daughter of her "whore mother" and asking Jane who was going to "save" her from "this one."

Thus, separate and distinct acts, occurring on separate days, and divisible in time, support defendant's convictions in counts 1, 3, 5, 6, 7, 8, and 9. Defendant argues that all of the acts were incident to his continuous course of conduct "from April to August 2016" and his single purpose and objective, of persuading Jane to get back together with him. Thus, he argues, he cannot be separately punished on counts 3, 5, 6, 7, 8, and 9, given the four-year term imposed on count 1. We disagree.

As noted, "a course of conduct *divisible in time*, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11, italics added.) The trial court implicitly found and substantial evidence shows that defendant's convictions in counts 1, 3, 5, 6, 7, 8, and 9 are based on separate acts. Those separate acts were divisible in time because they occurred on separate days. Thus, even if all of the acts were incidental to defendant's single intent, purpose, and objective of persuading Jane to get back together with him, separate punishment was properly imposed on counts 1, 3, 5, 6, 7, 8, and 9.

D.  *Defendant's Prison Prior Enhancement Must Be Stricken*

In supplemental briefing, the parties agree that defendant's judgment must be modified to strike his one-year prison prior enhancement, in light of the October 8, 2019 enactment of Senate Bill No. 136, which amended section 667.5 subdivision (b), effective January 1, 2020.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342.)  We agree that the judgment must be amended to strike the one-year prison prior enhancement.

Under newly amended section 667.5, subdivision (b) (Stats. 2019, ch. 590, § 1), a one-year prison prior enhancement only applies if the defendant's prior prison term was served for a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).  As the parties agree, defendant did not serve his prior prison term for such a sexually violent offense.  The parties also agree, as do we, that under the *Estrada* rule (*In re Estrada* (1965) 63 Cal.2d 740, 744-745 (*Estrada*)), the amendment to section 667.5, subdivision (b) is ameliorative and, because there is no indication that the Legislature intended the amendment to apply only prospectively, the amendment applies retroactively to defendant, because his judgment was not final on appeal when Senate Bill No. 136 went into effect on January 1, 2020.  (*People v. Lopez, supra,* 42 Cal.App.5th at p. 341; *People v. Jennings* (2019) 42 Cal.App.5th 664, 681-682; *People v. Keene* (2019) 43 Cal.App.5th 861, 865.)

Thus, we strike the one-year prison prior enhancement from defendant's six-year four-month sentence, which reduces his sentence to five years four months.  We remand the matter to the trial court so that it may exercise its sentencing discretion anew, if and to the extent the court deems resentencing appropriate.  We express no opinion concerning

33

whether or how the court should exercise its sentencing discretion anew on remand, in light of this one-year reduction to defendant's sentence. (*People v. Jennings*, *supra*, 42 Cal.App.5th at p. 682; *People. v. Keene*, *supra*, 43 Cal.App.5th at p. 865.)

## IV.  DISPOSITION

The judgment is modified to strike defendant's one-year prison prior enhancement. (§ 667.5, subd. (b).)  This modification reduces defendant's six-year four-month sentence to five years four months.  The matter is remanded to the sentencing court with directions to resentence defendant, if the court wishes to change its exercise of its sentencing discretion in light of the reduced sentence.  On remand, the court is to prepare an amended abstract of judgment reflecting this court's modification to the judgment, and any resentencing, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


FIELDS _____
                                                                                      J.

We concur:


SLOUGH _____
            Acting P. J.


MENETREZ _____
                        J.


34

Filed 3/18/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

**<u>ORDER</u>**

| | |
|---|---|
| THE PEOPLE, | E070518 |
| Plaintiff and Respondent, | (Super.Ct.No. INF1600985) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| MARIO CRUZ, JR., | |
| Defendant and Appellant. | |

The court has reviewed a request filed March 13, 2020, to publish the nonpublished opinion filed in the above matter February 26, 2020. The request is GRANTED. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c)(2) and (c)(4).

IT IS SO ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

<u>FIELDS</u>
                                       J.

We concur:

<u>SLOUGH</u>
          Acting P. J.


<u>MENETREZ</u>
               J.